## Wallenty Bunida, Appellee, v. Armour & Company, Appellant.

### Gen. No. 14,602.

1. MASTER AND SERVANT—*when obligation to furnish safe place arises.* If an employer, either expressly or impliedly, directs an employe to perform work in a particular place, the law raises the duty on the part of the employer to use reasonable care to have and keep such place in a reasonably safe condition for the performance of such work, and a breach of such duty constitutes negligence.

2. MASTER AND SERVANT—*when obligation to furnish safe place does not arise.* It is not sufficient to constitute negligence on the part of the employer, that an employe, of his own volition, engages in work he has not been directed by his employer, either expressly or impliedly, to perform, in a place where he has not been directed, either expressly or impliedly, to go, although such place be unsafe and dangerous. The duty of the employer to the employe to have and keep a place reasonably safe does not exist unless the employer or his representative knows or has reason to believe that the employe is serving his employer in such place.

Action in case for personal injuries. Appeal from the Circuit Court of Cook county; the Hon. MERRITT W. PINCKNEY, Judge, presiding. Heard in this court at the March term, 1909. Reversed with finding of facts. Opinion filed October 7, 1909. Rehearing denied October 21, 1909.

**Statement by the Court.** In an action on the case brought by appellee, plaintiff, against appellant, defendant, to recover for a personal injury alleged to have been sustained by plaintiff through the negligence of the defendant, plaintiff had judgment for $8,000, and the defendant appealed. The declaration in a single count alleged that defendant operated a slaughtering establishment in Chicago; that plaintiff was employed by defendant to work therein; that it was the duty of defendant to use care, etc., to provide a safe place for plaintiff to work, etc.; that defendant "carelessly, negligently, knowingly, wrongfully and improperly allowed and permitted certain portions of the premises and buildings of the defendant there to be and to remain dark, without light, so that persons

passing along and through said building and premises could not properly see their way; and while the plaintiff, with all due care and caution for his own personal safety, was, under the order and direction of the defendant, on, to-wit: the date last aforesaid, passing along and through a certain building of the defendant on defendant's premises, by reason of the unlighted or deficiently lighted condition there existing, the plaintiff was then and there, by and through a certain servant or agent of the defendant, who was not a fellow servant of the plaintiff, wrongfully, carelessly, negligently and improperly struck upon and against his, plaintiff's, body with a sharp pin or knife or instrument, without any fault on the part of plaintiff, so that plaintiff's left arm and hand were greatly and severely injured, wounded and disordered, so that the plaintiff's said left arm and hand were necessarily and unavoidably cut off,'' etc.

Plaintiff when injured was working on the fourth floor of a building of defendant, in which hams were cured in pickle. The room was upwards of one hundred feet long from north to south and its width somewhat less. It was not divided by any permanent partition. Near the middle of the room, from east to west, were double rows of posts, running north and south, thirteen feet apart, and the distance between the two rows was the same. The hams were cured in vats four feet in diameter and three and a half feet high. From each post in the east row, double tiers of vats, two vats high, were placed on the floor, extending back to the east wall. Similar tiers of vats extended from each post in the west row back to the west wall, and also extended four feet east from the posts. This left, between the ends of the tiers of vats on either side, a main aisle or passage, nine feet wide, called the *main alley*, extending from north to south across the room, and on each side of such main alley eight or nine aisles or passages called by the witnesses *sections*, each five feet wide and extending back east or west from the main alley to the end of the room. To

cure hams, a vat was filled with hams and the vat then
filled with pickle. A movable cover was then placed in
the top of the vat to keep the hams under the surface
of the pickle. The hams were left in pickle about
sixty days, and during that time were overhauled
three or four times in the manner hereinafter stated.
The building was eight stories high. On some of the
upper floors pork was cured in large casks called
tierces. In curing such pork a tierce was filled with
pork, the tierce then filled with pickle and headed up.
In the process of curing it was necessary, from time
to time, to roll the tierces. When the upper floors
became crowded with tierces of pork in the process of
curing, it was the practice to fill *sections* on the fourth
floor with such tierces. When hams were overhauled,
all of the vats facing a section on either side were
overhauled at the same time. When a section was to
be overhauled in which tierces of pork had been
stored, the tierces were all rolled out of such section
into another section before the work of overhauling
was begun. The work of overhauling the hams in the
vats was under the charge of foreman Lynn, who had
three or four gangs of men, of four each, engaged in
such work. The work of rolling and piling the tierces
of pork was under the charge of foreman Kaufman,
who had three or four gangs, of four to six men each,
engaged in that work. When foreman Lynn desired
to overhaul a section in which tierces of pork were
stored, he notified foreman Kaufman and the latter
then sent one of the rolling gangs under his charge to
roll the tierces out from such section into another sec-
tion. Before the day of the accident all of the tierces
in section four, on the east side of the main alley, had
been rolled out from that section by a rolling gang
sent for that purpose by foreman Kaufman. On the
morning of the day of the accident an overhauling
gang of four men—Buzek, Kuzwske, Luchowicz and
Lubruski—began the work of overhauling the hams in
the vats facing section four. They began at the east
end of the section and worked west. They had and

used in their work a table, a truck on which stood a barrel containing pickle, a force pump which stood on the barrel and took pickle from it, and about six feet of hose leading from the pump, at the end of which was a hollow perforated needle, about the size of a lead pencil and six or eight inches long. In overhauling, one man took a ham from a vat and passed it to a second man, who inserted into it the needle; a third man then operated the pump, which forced the pickle through the needle into the ham; the ham was then passed to the fourth man, who put it in another vat. When the hams had been so transferred, the pickle was also transferred by two men by the use of a bucket. The men then proceeded to overhaul another vat in the same manner, and so on until all the vats facing the section were overhauled. Section four was about sixty feet long, and at the time of the accident the overhauling gang had overhauled the vats from the east wall to about the middle of the section.

Plaintiff, as has been said, belonged to one of the rolling and piling gangs, and had worked in such gang five and a half months. About four o'clock in the afternoon of the day of the accident, foreman Kaufman took the gang to which plaintiff belonged from the fifth to the fourth floor, to a section next to the section in which the overhaulers were at work to clear the tierces of pork out of that section so that the overhaulers might begin overhauling the hams in it when they had completed the overhauling of section four. The men proceeded to roll the tierces from that section out into the main alley and then north in that alley into a vacant section. A few minutes before five o'clock foreman Kaufman returned to the section where his gang were at work. At that time all of the tierces but twelve or fourteen had been rolled out of the section. Plaintiff was the only member of the rolling gang who testified on the trial. He testified that Kaufman, when he came back, sent all of the men in plaintiff's gang, except himself and Youka, back to

the fifth floor and "told me to remain there and finish the work." On cross-examination he testified that Kaufman "says when he came, when he came over there, he sent the rest of the four men, the rest of the men, upstairs and told us to stay down there and finish the work.  *  *  *

Q.  And the finishing of the work meant the rolling of certain of the barrels to some other place that had not been moved by the gang, did it not? That is right, is it?

A.  Yes, finishing the work.

Q.  How many barrels did you roll?

A.  Twelve or fourteen barrels."

He also testified that when the gang worked together they had a lantern; that the men who went away took the lantern; that he asked Kaufman for a lantern and Kaufman said he could not give him one. Kaufman testified that when he returned there were only a few tierces remaining in the section; that he told the men to go up to the next floor when they had finished the section; that he did not tell plaintiff and his partner, or either of them, to stay on the fourth floor; that plaintiff did not ask him for a lantern or say anything about a lantern to him.

Plaintiff further testified that after Kaufman went away he finished the section where he was then working, went to another section, finished that, and then went to another section, where there was nothing; that he then passed along the main alley and saw Buzek in section four; that he asked him, "What are you doing here, John?" and he answered, "I am working here;" that he asked him if there were any tierces in that place, and Buzek answered that he did not know; that a little while later plaintiff started to walk east in section four; that he walked east thirty feet in that section, looking for tierces; that as he was so walking something struck him on the left wrist.

In fact he came in contact with the needle used in overhauling hams, which was then held by Buzek.

The wound inflicted by the needle became infected and it became necessary to amputate plaintiff's arm near the shoulder. The overhauling gang had just before the accident finished transferring the hams from one vat to another, and Luchowicz and Lubruski were engaged in transferring the pickle. While they were so engaged Kuzwske left the section and went into the main alley. Buzek went to near the main alley, had a conversation with plaintiff and then returned to the place where he had been at work. He testified that when he returned he went to the pump, "looked to see if the pickle was running right;" that he took the needle in one hand and started the pump with the other, and just then plaintiff's wrist came in contact with the needle; that he did not see plaintiff after he saw him in the main alley until his wrist came in contact with the needle. Luchowicz and Lubruski testified that plaintiff and Buzek splashed pickle on each other from a vat at the end of section four next to the main alley; that Buzek came back in the section to the place where he had been working; that plaintiff followed him as he came back; that Buzek took the needle in one hand and the pump lever in the other, and plaintiff raised or thrust forward his hand to strike Buzek and struck the needle. The defendant introduced evidence tending to show that Buzek had made statements in conflict with his testimony on the trial, and corroborative of the testimony of Luchowicz and Lubruski.

The overhauling gang had and used in their work a large lamp and two lanterns. The large lamp was attached to the lower end of a stick like a broom handle, at the upper end of which was a spear which was driven into the ceiling. By this means the lamp was suspended in the middle of the section above the vats, and was moved from place to place as the men moved from one vat to another. The smaller lamps or lanterns were placed on the vats. Kuzwske took one of the small lamps when he left the section, so that at the time of the accident there were in the section at the

place of the accident only the large suspended lamp and one smaller lamp or lantern. Plaintiff and Buzek testified that the lamps gave very little light, that the section was dark. Plaintiff testified that he did not see any one in the section before his wrist came in contact with the needle, and Buzek that he did not see plaintiff just before he was injured. Luchowicz and Lubruski testified that they could see plainly from where they were to the main alley.

JUDAH, WILLARD, WOLF & REICHMANN, and A. R. URION and A. F. REICHMANN, for appellant.

HENRY R. RATHBONE and SCOTT O. CAVETTE, for appellee.

MR. JUSTICE BAKER delivered the opinion of the court.

It is the duty of the employer to use reasonable care to furnish his employe a reasonably safe place to perform the work he is directed by the employer, either expressly or impliedly, to perform. The work of the employer is to be under his own control, and it is for him, or his representative, to give such orders and directions as he may deem proper in respect to the work to be performed by his employe and the place in which such work shall be done. If an employer, either expressly or impliedly, directs an employe to perform work in a particular place, the law raises the duty on the part of the employer to use reasonable care to have and keep such place in a reasonably safe condition for the performance of such work, and a breach of such duty constitutes and is negligence. But it is not sufficient to constitute negligence on the part of the employer, that an employe, of his own volition, engages in work he has not been directed by his employer, either expressly or impliedly, to perform, in a place where he has not been directed, either expressly or impliedly, to go, although such place be unsafe and dangerous. The duty of the employer to the employe

to have and keep a place reasonably safe does not exist unless the employer or his representative knows, or has reason to believe, that the employe is serving his employer in such place.

The defendant is a corporation, and could act and give directions only through its proper officer or agent. There is no claim that any one assumed, on behalf of defendant, to direct where the plaintiff should work, or what work he should perform, except his foreman, Kaufman. The room in which plaintiff was injured was lighted only by artificial lights. Near the middle of the room, from east to west, was a main alley running north and south. On the east side of this alley were nine aisles, called sections, each five feet wide and about sixty feet long, and on the west side, eight sections of the same width, but somewhat shorter. On each side of each section were two tiers of vats, in which hams were placed and covered with pickle, for the purpose of curing. This process occupied about sixty days, during which time the hams were overhauled several times by an overhauling gang, who were furnished lamps or lanterns. Plaintiff had nothing to do with the overhauling of hams. On the upper floors of the same building pork was cured in tierces, which were headed up. It was necessary to roll these tierces several times during the process of curing. When there was not sufficient room on the upper floors for the storage of tierces of pork, it was the practice to fill some of the sections on the fourth floor with such tierces. When the hams in any section in which tierces were stored were to be overhauled, it was necessary to roll the tierces of pork out of said section so that the overhauling gang might go through the section with the table and truck, with a barrel on it, which they used in their work. It was the duty of Kaufman, plaintiff's foreman, on notice by the foreman of the overhauling gang that he desired to overhaul a section in which were tierces, to roll such tierces out of that section. The overhauling gang were overhauling section four, from which all the tierces had

been removed, and their foreman notified Kaufman to clear out another section which he intended to overhaul when the overhauling of section four was completed. It was under these circumstances, and for the purpose above stated, that foreman Kaufman took the gang to which plaintiff belonged to the fourth floor and set them to work rolling the tierces from the section he had been so notified to clear out. The only work that Kaufman had in hand on that floor was the clearing out of the section he had been so notified to clear out.

The only testimony as to any express directions of Kaufman to plaintiff, or the gang to which he belonged, was the testimony of plaintiff and of Kaufman. Plaintiff testified that when nearly all the tierces had been rolled out of the section in which his gang were working, Kaufman came back to the section, sent four of the gang upstairs, told plaintiff and another man to remain, "and told us to stay down here and finish the work," and further testified as follows:

"Q. And the finishing of the work meant the rolling of certain barrels to some other place that had not been moved by the gang? That is right, is it? A. Yes, finishing the work.

Q. How many barrels did you roll? A. Twelve or fourteen barrels."

Kaufman testified that he came back to the section about the time stated by plaintiff. He denied that he then gave any order that a part of the men should go to another floor and plaintiff and another man remain. His testimony as to the direction he then gave is as follows: "I told them to go up to the next floor when they got through with that section. They had only a few tierces to roll when I was there." Plaintiff's testimony does not tend to prove an express direction by Kaufman to him, or any member of the gang to which he belonged, to go into any other section or perform any work on the fourth floor, except to finish the work

in which they were then engaged, which was the clearing out of the section in which they were then working; and there is no evidence in the record tending to show an express direction to go to any other section or perform any other work on that floor.

There is no evidence tending to show that the rolling gang to which plaintiff belonged, or any member or members of it, had ever before, after clearing out a section on the fourth floor, gone into any other section on that floor for the purpose of removing tierces therefrom, or for any other purpose; no evidence that such rolling gang had ever performed any work on that floor except to clear out a section when directed so to do by their foreman. It is true the plaintiff testified that he had to go and "look over the sections," and that he rolled tierces out of other sections than the one his gang was engaged in clearing out. But his statement that he had to "look over the sections," was the statement of a conclusion, not of a fact, and he testified to no order, no previous practice, no fact, no circumstance, tending to show that it was his duty to look over any other section or remove tierces from any other section than the one he and the other members of his gang were clearing out. There is in the record no evidence from which the jury might properly find that the defendant impliedly directed the plaintiff, or any member of the gang to which he belonged, to go into said section four, or to go into any section on the fourth floor other than the sections from which they were rolling tierces and the section into which they rolled such tierces.

The evidence, in our opinion, fails to show that plaintiff went into the section of defendant's building, in which he was injured, under or pursuant to any direction of defendant, or of any representative of defendant, either express or implied, or in the performance of any work he had been directed by defendant, either expressly or impliedly, to perform, or that defendant, or any representative of defendant, knew

or had reason to believe that plaintiff had gone, or would go, into said section with the intention of serving the defendant. In the absence of any such direction or knowledge, the law did not raise on the part of the defendant the duty to the plaintiff alleged to have been neglected.

In our opinion it does not appear from the evidence that the defendant is guilty of the negligence alleged in the declaration in this case, and the judgment of the Circuit Court will therefore be reversed, with a finding of facts, and the cause will not be remanded.

*Reversed with finding of facts.*